IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| QWEST CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CIV 07-163 RB/WDS |
| | ) | |
| ELEPHANT BUTTE IRRIGATION | ) | |
| DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

I.    INTRODUCTION

**THIS MATTER** comes before the Court on Defendant Elephant Butte Irrigation District's ("EBID") Motion in Limine to Preclude Use of Expert Testimony or, Alternatively, to Extend Discovery Deadlines [Doc. 50] and Plaintiff Qwest Corporation's ("Qwest") Motion for Summary Judgment [Doc. 54]. Having reviewed the parties' submissions and the relevant law, I hereby **DENY** EBID's Motion in Limine, as well as its Motion to Extend Discovery. Moreover, because of the multitude of material issues of fact that remain, I have determined that oral arguments will not assist the Court at this time. Accordingly, Qwest's Motion for Summary Judgment is hereby **DENIED**.

## II.    BACKGROUND.

### A.    EBID.

EBID is a quasi-municipal entity[1] created under specific New Mexico statutes.  *Sanders v. Elephant Butte Irrigation Dist.*, 112 F.3d 468, 469 (10th Cir. 1997); *Atchison, Topeka, & Santa Fe Ry. Co. v. Elephant Butte Irrigation Dist.*, 110 F.2d 767, 768 (10th Cir. 1940).  *See also* N.M. Stat. Ann. §§ 73-10-1 - 73-11-55 (2008); *Elephant Butte Irrigation Dist. v. U.S. Dep't of Interior*, 269 F.3d 1158, 1160 (10th Cir. 2001) ("*EBID II*"); *Sanders*, 112 F.3d at 469 n.1.  EBID was formed by local water users for the purpose of cooperating with the United States Bureau of Reclamation's Rio Grande Project to distribute nonpotable water to EBID members, *EBID II*, 269 F.3d at 1162; *Sanders*, 112 F.3d at 469; *City of El Paso v. Reynolds*, 563 F. Supp. 379, 380 (D.N.M. 1983); *Elephant Butte Irrigation Dist. v. Gatlin*, 294 P.2d 628, 630 (N.M. 1956), primarily for agricultural use, Anita P. Miller, *Conflict in the Forests, in the Waters, and on the Ranges of the West*, 32 Urb. Law. 859, 863 (2000).  At Project creation, the federal government acquired the existing irrigation facilities and rights of way from the local water users.  *See* Ira G.

---

[1] New Mexico case law does not reveal a clear picture of EBID's nature.  In *Hooker v. Village of Hatch*, the New Mexico Supreme Court found that EBID "is not an agency of the State of New Mexico," and noted that "[t]he irrigated lands are in private ownership, and the district acts as the agent of the owners for their private benefit." 344 P.2d 699, 702 (N.M. 1959).  Addressing a case involving another irrigation district cooperating with the United States, the New Mexico Court of Appeals stated "that irrigation districts are not municipal corporations, but public corporations for municipal purposes," and refused to delve into the meaning of "quasi-municipal." *Tompkins v. Carlsbad Irrigation Dist.*, 630 P.2d 767, 769 (N.M. Ct. App. 1981).  That same court pointed out "that irrigation districts are organized for . . . a public function . . . not for private gain," and that "irrigation is a public use." *Id.* Importantly, the court found that the Carlsbad Irrigation District falls under N.M. Stat. Ann. § 73-13-44 (2008), which specifies that irrigation districts are "bodies corporate and politic."  On the other hand, in two EBID cases, the New Mexico Supreme Court has stated that courts are not "bound to that strictness which applies when determining the powers of municipal corporations" because the New Mexico Legislature granted the EBID board such broad discretion.  *Stahmann v. Elephant Butte Irrigation Dist.*, 294 P.2d 636, 641 (N.M. 1956); *Sperry v. Elephant Butte Irrigation Dist.*, 270 P. 889, 891 (N.M. 1928).

EBID appears to follow *Tompkins* (Def.'s Resp. Mot. Deposit Funds [Doc. 22] at 1-2), and characterizes itself as a political subdivision of the State of New Mexico and as a public agency (Def. Elephant Butte Irrigation Dist.'s Resp. Pl. Qwest Corp.'s Mot. Summ. J. [Doc. 62] at ¶¶ 38-39); one, however, that does not share in general tax revenues (*id.* at ¶ 40).

2

Clark, *Water in New Mexico: A History of Its Management and Use*, 98, 196 (1987). Additionally, EBID is a successor in interest to water users' associations that were in existence prior to 1917.  *See* N.M. Stat. Ann. §§ 73-10-1, -45; Clark, *supra*, at 196.  At least one source characterizes EBID as a contracting agency that holds its members' water rights in trust and contracts with the Bureau of Reclamation on their behalf.  Len Stokes, *The Transfer of Agricultural Water to Municipal and Industrial Use in Southern New Mexico*, 11 U.S.-Mex. L.J. 89, 90 (2003).  *See also* N.M. Stat. Ann. § 73-10-19 (2008) ("The title to all property acquired under the provisions of this act shall immediately and by operation of law vest in such irrigation district, in its corporate name, and shall be held by such district in trust for, and is hereby dedicated and set apart for the uses and purposes set forth in this act.").

EBID acts primarily through a board of directors.  *See* N.M. Stat. Ann. § 73-10-16 (2008).  EBID members (water rights owners) elect the directors, and the directors are EBID members themselves.  *See* N.M. Stat. Ann. §§ 73-10-5, -6 (2008).

Pursuant to contract, the federal government built and/or improved the irrigation facilities (ditches, canals, laterals, drains, etc.) within EBID with the understanding that local water users would reimburse the federal government for the construction, maintenance, and operation costs over an extended period of time.  *See Bean v. United States*, 163 F. Supp. 838, 843-44 (Ct. Cl. 1958); *Sperry*, 270 P. at 890; Clark, *supra*, at 196.  This reimbursement took the form of pro rata assessments.  *Hooker*, 344 P.2d at 702; Stokes, *supra*, at 90.  Initially, the farmers paid the assessments directly to the federal government.  Stokes, *supra*, at 90.  Later, however, EBID began to collect the assessments and pass them on to the federal government.  Clark, *supra*, at 196; Stokes, *supra*, at 90.  The assessments were, and are, used solely for the purposes of the

district.  *See Burges v. Comm'r of Internal Revenue*, 25 B.T.A. 1191, 1192 (B.T.A. 1932).

Despite providing a general public benefit in the terms of flood control, etc., EBID today

continues to collect assessments only from its members in order to carry on operations.  (Def.'s

Resp. Mot. Deposit Funds at 2).  EBID earns revenue from its members via charges for water

delivery.  *See* N.M. Stat. Ann. §§ 73-11-28, -29 (2008).

By 1956, EBID had repaid approximately three-fifths of the construction debt due to the

United States.  *Gatlin*, 294 P.2d at 630.  EBID had paid off the remainder of the debt by 1971

Clark, *supra*, at 382, and in 1979, EBID took over the operation and maintenance of the

irrigation facilities, *Elephant Butte Irrigation Dist. v. U.S. Dep't of Interior*, 1992 WL 47632, at

*1 (D. Utah Sept. 3, 1992).  The federal government, however, maintained ownership of the

facilities.  *See EBID II*, 269 F.3d at 1163; *El Paso County Water Improvement Dist. No. 1 v. City

of El Paso*, 133 F. Supp. 894, 900 (W.D. Tex. 1955).

In 1992, Congress authorized the Secretary of the Interior to transfer to EBID:

> title to such easements, ditches, laterals, canals, drains, and other rights-of-way,
> which the United States has acquired on behalf of the [P]roject, that are used
> solely for the purpose of serving the . . . district's lands and which the Secretary
> determines are necessary to enable the . . . district to carry out operation and
> maintenance with respect to that portion of the . . . [P]roject . . . .

Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. 102-575, § 3301, 106

Stat. 4600, 4705-06 (1992).  Although the federal government retains title to the dams within

EBID, *id.* at § 3302, 106 Stat. 4706, and continues to control the release of Project water, *see

Sanders*, 112 F.3d at 469 n.1; John E. Thorson et al., *Dividing Western Waters: A Century of

Adjudicating Rivers and Streams, Part II*, 9 U. Denv. Water L. Rev. 299, 456 (2006), the federal

government transferred title over the irrigation facilities and rights of way to EBID in 1996

4

(Magallanez Aff. [Doc. 64] at ¶ 8).  Consequently, EBID now owns both the facilities and rights of way in fee simple  (*See id.* at ¶ 3).

### B.      EBID AND QWEST.

Prior to 1986, the federal Bureau of Reclamation controlled the issuance of special use permits to third parties seeking to utilize the rights of way within EBID and charged a specified rate[2] that apparently had been in effect for some time.  (*See id.* at ¶ 9).  EBID took control of the permitting process in 1986 and continued to charge the specified rate.  (*Id.*).  In 1994, subsequent to the passage of the Reclamation Projects Authorization and Adjustment Act of 1992, but prior to the actual transfer of title, EBID enacted the Right of Use and License Policy.  (*Id.* at ¶ 8).  The Policy clarifies that a special use permit grants a "right-of-use" of EBID property, that a "land use fee" is the charge for that right of use, and that the term of a utility special use permit is twenty-five years.  (Policy [Ex. 1 to Doc. 22] at §§ IV(D), (F), V(E)(1)).  In 1995, EBID decided not to increase the charge for parallels,[3] but did begin charging fifteen cents per linear foot for crossings.  (Magallanez Aff. at ¶ 10).  It is unclear what the Bureau of Reclamation originally charged for crossings.

For approximately ten years, EBID did not increase the rates it charged for either parallels or crossings.  (*Id.* at ¶ 11).  Accordingly, until October 2005, EBID based its fees on a formula that incorporated a $0.01 per foot charge for parallels and a $0.15 per foot charge for crossings.  (*See* Oct. 12, 2005 Am. [Ex. A to Doc. 54] at ¶ 3).  Additionally, EBID charged an administrative fee in the amount of $300.00.[4]  (*See id.* at ¶ 1).  In 2005, EBID increased the

---

[2]  This specified rate included a charge of one cent per linear foot for parallels.
[3]  Though neither party defines the term "parallel" or "crossing," the Court presumes that a "parallel" includes third party facilities running parallel to an EBID ditch and a "crossing" is a third party facility that would cross over or under an EBID ditch.
[4]  It is unclear if the Bureau of Reclamation previously charged an administrative fee.

parallel and crossing fee portions of the formula to $0.25 and $0.50 per foot, respectively, and also increased the administrative fee to $500.00.  (*Id.* at ¶¶ 1, 3).  The administrative fee covers costs including, but not limited to:  engineering review, legal review, required federal, state, and local reviews, agency coordination, construction inspection, document preparation, rights-of-use assistance, and right-of-use and right-of-way appraisals.  (*Id.* at ¶ 1).

Qwest obtained at least four permits under the 2005 Fee Schedule, allegedly with a reservation of rights (Am. Cmplt. [Doc. 40] at ¶ 20), and on February 16, 2007, Qwest filed this lawsuit.  Because the land use fees are hotly disputed, a court fund has been established to receive any land use fees Qwest must pay to EBID during the pendency of this lawsuit.  *See* Order [Doc. 27].

In response to the lawsuit, EBID has amended its fee schedule on several occasions. First, on August 21, 2007, EBID adopted a fee schedule that was only applicable to telecommunications providers.  (Aug. 21, 2007 Am. [Ex. J to Doc. 54]).  Shortly thereafter, EBID refunded $28,446.47 to Qwest – purportedly the difference between the October 2005 fee schedule and the 2007 fee schedule.  (Magallanez Aff. at ¶ 22).  The 2007 schedule established a new formula for parallel and area[5] uses, reduced the parallel linear foot charge portion of the formula from $0.25 to $0.15, established a $0.10 per square foot charge for area uses, and instituted a new approach to crossing fees.  (Aug. 21, 2007 Am.).  Instead of charging per linear foot for a crossing, as was the previous practice, EBID began charging telecommunications companies a flat fee of $2,250.00 for any crossing up to fifty feet long.  (*See id.*).  EBID also charged an additional $250.00 for every additional fifty foot increment, even if the

---

[5] It is unclear what an area use is, but it does not appear that Qwest is challenging the area use fee.

telecommunications company only needed an additional foot.  (*See id.*).  For instance, the charge for a fifty-one foot crossing was $2,500.00.  (*See id.*).

EBID amended the Policy once again on February 13, 2008 in an attempt to eliminate the board's discretion over the permit fees charged to telecommunications providers.  (*See* Feb. 13, 2008 Am. [Ex. M to Doc. 54]).  Again, this amendment only applied to telecommunications providers.  (*Id.*).  EBID reportedly amended the Policy yet again on March 12, 2008, though neither party has submitted that amendment to the Court.  (*See* Apr. 9, 2008 Am. [Doc. 62-11]) (indicating a March amendment).  According to EBID, this amendment clarified that the crossing permits for telecommunications providers had a term of twenty-five years, but that the fee would be prorated if the provider needed a permit for a shorter period of time.  (Def.'s Resp. Mot. Summ. J. [Doc. 62] at ¶ 35).  EBID enacted its final Policy amendment, at least thus far, on April 9, 2008.  (Apr. 9, 2008 Am.).  The April amendment completely eliminated EBID's use of the October 2005 fee schedule (for those other than telecommunications providers) and applied the telecommunications charging scheme to all third party entities seeking use of EBID property. (*Id.*).

Despite the amendments, Qwest asks this Court to declare both the 2005 and 2007 EBID fee schedules unlawful, to order EBID to refund the totality of all land use fees charged to Qwest under both fee schedules, and to find that EBID may charge third parties only cost-based fees. (Am. Cmplt. at 6-7).

### III.    JURISDICTION.

Courts across the country have debated the jurisdictional meaning of a section of the Telecommunications Act of 1996, 47 U.S.C. § 253 (2008), the statute at the heart of this case. One issue, for instance, is whether the statute grants a private right of action.  *Compare Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1265-1267 (10th Cir. 2004) (finding no private right of action) *with TCG Detroit v. City of Dearborn*, 206 F.3d 618, 622-24 (6th Cir. 2000) (finding a private right of action).  In circuits that have determined that the statute does not grant a private right of action, however, cases have gone forth under the Supremacy Clause, U.S. Const. art. VI, cl. 2.  *See Santa Fe*, 380 F.3d at 1269.

An additional issue is whether a plaintiff may bring an action pursuant to subsection (c) of § 253 (under the auspices of the Supremacy Clause), or whether subsection (c) is subsidiary to an action brought pursuant to subsection (a) of § 253.  *See TCG Detroit*, 206 F.3d at 623.  The Tenth Circuit has decided that plaintiffs must seek redress pursuant to subsection (a), and that subsection (c) is an exception to the general rule laid out in subsection (a).  *See Santa Fe*, 380 F.3d at 1269.

Yet another issue is whether subsection (d) of § 253 requires plaintiffs to pursue their cases in front of the Federal Communications Commission (FCC) or whether the law permits plaintiffs to directly file suit in court.  *TCG Detroit*, 206 F.3d at 623.  Courts have been consistent in holding that cases involving the subsection (c) exception may be brought directly to court.  *See Santa Fe*, 380 F.3d at 1266 (highlighting the congressional intent to allow "local communities to deal with their rights of way . . . and meet any challenge on home ground in their local district courts.").

Qwest has met all of the jurisdictional requirements set forth by the Tenth Circuit. Qwest's action is primarily one of federal preemption, so the Court has federal question jurisdiction under 28 U.S.C. § 1331 (2008).  Moreover, Qwest brings its action pursuant to 47 U.S.C. §253(a), and §253(c) could very well play an integral role in this case.  Additionally, Qwest's failure to bring this case before the FCC is entirely appropriate under the law.  Lastly, the Court chooses to exercise its supplemental jurisdiction over the state law claim because that claim is closely aligned with the federal questions and arises out of the same set of facts.  *See* 28 U.S.C. § 1367 (2008).

## IV.  MOTION IN LIMINE.

EBID seeks to exclude a Qwest exhibit [*see* Ex. H to Doc. 51] prepared by Lynn Norsworthy, as well as any Norsworthy testimony that EBID characterizes as expert, under Fed. R. Civ. P. 26(a)(2) and 37(c).  (Mot. Limine at 1, 7-13).  Alternatively, EBID seeks to extend the discovery deadlines.  (*Id.* at 1, 13).

On July 6, 2007, EBID asked Qwest to identify its Fed. R. Civ. P. 30(b)(6) witnesses.  In particular, EBID sought the identity of witnesses that would testify as to the alleged prohibitive effect of the EBID fees.  (*See* Letter from Lee E. Peters, EBID Counsel, to David R. Goodnight & Grant D. Wiens, Qwest Counsel (Nov. 6, 2007) [Ex. F to Doc. 51] at 2).  EBID appears to reiterate this request in a letter dated November 6, 2007.  (*See id.*).  In response, Qwest designated Lynn Norsworthy as a Rule 30(b)(6) witness on the issue of prohibition.  (*See* Letter from David R. Goodnight, Qwest Counsel, to Lee E. Peters, EBID Counsel (Jan. 4, 2008) [Ex. 1 to Doc. 50] at 1).  Ms. Norsworthy is currently a Finance Manager with Qwest and has worked for Qwest and its predecessor(s) for more than twenty years.  (Norsworthy Dep. [Ex. 3 to Doc.

50] at 3-4).  EBID issued its Notice of Deposition [Ex. G to Doc. 51] for Ms. Norsworthy on November 16, 2007.

The primary source of EBID's consternation is a summary prepared by Ms. Norsworthy entitled "Land Use Cost Estimate - Based on EBID Price Schedule."  Ms. Norsworthy prepared the Estimate at the request of Qwest counsel, and she utilized her own knowledge and that of Qwest network managers to prepare the Estimate, along with corporate reports.  (*See, e.g.*, Norsworthy Dep. at 22, 30-32, 34, 36, 45-53).  Qwest did not disclose this document until the afternoon of January 7, 2008 – the day before Ms. Norsworthy's scheduled deposition (Mot. Limine at 3), which was set to begin at 9:00 A.M. (*see* Notice Dep.).  The Estimate purports to portray the losses Qwest would suffer if every single municipality in New Mexico immediately adopted fees similar to those charged by EBID.  (*See* Estimate).  Presumably, Qwest thought this information relevant because the First Circuit considered somewhat similar information when it decided Puerto Rico Tel. Co. v. Municipality of Guayanilla, 450 F.3d 9, 16-18 (1st Cir. 2006).

Fed. R. Civ. P. 30(b)(6) permits a corporation to testify through its "officers, directors, or . . . other persons who consent." Fed. R. Civ. P. 30(b)(6).  Rule 30(b)(6) witnesses "must testify about information known or reasonably available to the organization."  *Id.*  An expert witness provides "scientific, technical, or other specialized knowledge [that] will assist the trier of fact . . ., [and she is] qualified as an expert [via her] knowledge, skill, experience, training, or education . . . ."  Fed. R. Evid. 702.  "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently . . . the particular issue without [the assistance of an expert]."  Fed. R.

Evid. 702 advisory committee's notes. Rule 26(a)(2) requires disclosure of expert testimony and Rule 37(c), in turn, provides remedies for nondisclosure. Fed. R. Civ. P. 26(a)(2) & 37(c).

The Court finds that Ms. Norsworthy is not an expert witness. The Estimate is essentially a rather simple mathematical analysis based on information both known and reasonably available to Qwest. *See* Fed. R. Civ. P. 30(b)(6); Norsworthy Dep. at 22, 30-32, 34, 36, 45-53. The Court has faith that an "untrained layman" could understand the addition, subtraction, multiplication, and division displayed in the Estimate without the assistance of an expert. *See* Fed. R. Evid. 702 advisory committee's notes. Moreover, this case will be tried to the bench, and the Court understands the Estimate. Lastly, unlike the defendant in *Guayanilla*, 450 F.3d at 16-17, EBID has submitted sufficient information to call Qwest's assertions into question. (*See, e.g.*, Reading Aff. [Doc. 65] at ¶¶ 51-58) .

Even if Ms. Norsworthy's training and experience could qualify her as an expert in another case, she is not an expert on the prohibition matter in this case. Accordingly, the Court hereby **DENIES** EBID's motion to exclude the Estimate and Ms. Norsworthy's testimony and also **DENIES** Qwest's alternative motion to extend discovery deadlines.

## V.      SUMMARY JUDGMENT.[6]

### A.      Standards.

"[I]f the pleadings [and] the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[,]" then summary judgment is proper. Fed. R. Civ. P. 56(c).

---

[6] The Court takes this opportunity to note that both of the other prohibition cases summarily decided in this district involved undisputed facts. *See Santa Fe I*, 224 F. Supp. 2d at 1307; *Bd. of County Comm'rs of Grant County v. US West Communications*, No. 98-1354, slip op. at 4 (D.N.M. June 26, 2000).

Courts "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the [nonmovant]." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1146 (10th Cir. 2005). "The movant bears the initial burden of . . . demonstrati[ng] . . . the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998).

If the movant meets this burden, then "the burden shifts to the nonmovant." *Id.* at 671. The nonmovant must "go beyond the pleadings and set forth" admissible evidence consisting of "specific facts . . . from which a rational trier of fact could find for the nonmovant." *Id.* (citations and internal quotations omitted). The nonmovant must identify these facts with "reference to . . . deposition transcripts or specific exhibits . . . ." *Id.* (citations omitted). The nonmovant must show more than a mere "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and the organization must base its evidence "on more than [bare] speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmovant cannot rely purely on "conclusory allegations . . . to defeat . . . a motion for summary judgment." *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

Federal courts sitting in diversity "seek to ascertain and apply . . . state law." *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (internal quotations omitted). This rule also applies if a federal court exercises supplemental jurisdiction over a state law claim in a federal question case. *BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999). If state law does not address the issue, federal courts "must . . . predict what the state's highest court would do." *EMCASCO*, 483 F.3d at 666 (internal quotations omitted).

To determine what the highest court would do, federal courts may look to "decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law."  *Id.* (internal citations and quotations omitted).

**B.    The Law.**

      **1.    Federal Law**.

The Supremacy Clause mandates that federal law preempt state and local law.  *See* U.S. Const. art. VI, cl. 2.  Federal statutes preempt local law if it is clear that Congress intended preemption.  *RT Communications, Inc. v. FCC*, 201 F.3d 1264, 1269 (10th Cir. 2000).  The Telecommunications Act of 1996, codified at 47 U.S.C. § 151 *et seq.*, states that "[n]o [s]tate or local statute or regulation, or other [s]tate or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a).  The Tenth Circuit has ruled that § 253 expresses a clear congressional intent to preempt.  *Santa Fe*, 380 F.3d at 1269.  Despite this provision, Congress also sought to safeguard municipal power to manage municipal rights of way, including the power "to require fair and reasonable compensation . . . for the use of public rights-of-way [by telecommunications providers]."  *See* 47 U.S.C. § 253(c); *Santa Fe*, 380 F.3d at 1269.

Given the contradictory nature of subsections (a) and (c), the Tenth Circuit, as well as most other courts who have considered the issue, typically consider subsection (c) an exception to the general rule set out in subsection (a).  *See, e.g.*, *Santa Fe*, 380 F.3d at 1269.  Otherwise stated, subsection (c) provides local governments with a safe harbor.  *See, e.g.*, *TCG New York,*

*Inc. v. City of White Plains*, 305 F.3d 67, 78 (2nd Cir. 2002).   Accordingly, the Tenth Circuit

adopted a two-step process to test whether a local legal requirement violates § 253 (a).   *Santa Fe*,

380 F.3d at 1269.

First, a court must determine whether the challenged requirement(s) "prohibit or have the

effect of prohibiting" the provision of telecommunications service.   47 U.S.C. § 253 (a); *Santa

Fe*, 380 F.3d at 1269.   The prohibitive effect of the local scheme need not be "complete" or

"insurmountable."   *RT*, 201 F.3d at 1268.   Rather, the plaintiff need only show that an individual

requirement "materially inhibits" the provision of service.[7]   *See Santa Fe*, 380 F.3d at 1271; *In

re Cal. Payphone Ass'n*, 12 F.C.C.R. 14191, 14206 (1997) ("[W]e consider whether the

[o]rdinance materially inhibits or limits the ability of any competitor or potential competitor to

compete in a fair and balanced legal and regulatory environment.").   Additionally, if the local

provisions grant the local governmental entity the power to wield "broad" or "unfettered"

discretion over a telecommunications provider, then those provisions are most likely prohibitive

– unless the local governmental entity demonstrates that its right of way management requires

such discretion.   *See Santa Fe*, 380 F.3d at 1270, 1270 n.9, 1272.

*Santa Fe* offers some further insight into the meaning of "prohibitive."   There, the

prohibitive ordinance included provisions that required Qwest to obtain an appraisal of the fair

market rental value of the right of way from a city-approved appraiser, pay the appraisal-based

rent, lay twice as much conduit as Qwest actually needed, and then transfer all of that conduit to

the city.   *Qwest Corp. v. City of Santa Fe*, 224 F. Supp. 2d 1305, 1309 (D.N.M. 2002) ("*Santa Fe

I*").   The result was that the cost for Qwest's utility cabinets would quadruple (from

---

[7]   In a footnote, the Tenth Circuit states that § 253(a) "bars any legal requirement [that] *may* have" a prohibitive effect.   *Santa Fe*, 380 F.3d at 1270 n.9 (emphasis added).

approximately $500,000.00 to over $2 million) and that the excess conduit requirement would increase Qwest's conduit installation costs by 30% to 59%. *Santa Fe*, 380 F.3d at 1271; *Santa Fe I*, 224 F. Supp. 2d at 1324-25. The Tenth Circuit characterized the utility cabinet rental fee as "massive" and characterized the combined increases as "substantial costs." *Santa Fe*, 380 F.3d at 1271. Importantly, however, the Tenth Circuit also noted that not every cost[8] increase has a prohibitive effect. *Id.*

Only if the court finds a local requirement prohibitive will the court move on to consider whether the safe harbor applies. *See Santa Fe*, 380 F.3d at 1269. The local governmental entity carries the burden of showing that the requirement(s) in question are protected under § 253(c). *Id.* at 1272 n.10. Section 253(c) states:

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c). Congress passed the Telecommunications Act with the intent to promote competition among telecommunications providers. *See Santa Fe*, 380 F.3d at 1272. Consequently, both right of way management and the compensation charged for the use of rights of way must be "competitively neutral *and* nondiscriminatory." *Id.* (emphasis added). The Tenth Circuit has not addressed whether the neutrality and nondiscrimination requirements within § 253(c) apply only between telecommunications providers or whether they also apply between telecommunications providers and other utilities and/or individuals. Cases out of other circuits, however, suggest that Congress intended the neutrality and nondiscrimination

---

[8] Additionally, no federal court has limited a governmental entity to the strict recovery of costs. *See, e.g.*, *Santa Fe I*, 224 F. Supp. 2d at 1327.

requirements to apply amongst telecommunications providers.  *See TCG New York*, 305 F.3d at 80.  *See also N.J. Payphone Ass'n, Inc. v. Town of West New York*, 299 F.3d 235, 247 (3rd Cir. 2002); *Cablevision, Inc. v. Pub. Improvement Comm'n*, 184 F.3d 88, 105 (1st Cir. 1999).

The Tenth Circuit adopted the totality of the circumstances test utilized by the Sixth Circuit to determine whether compensation rates are "fair and reasonable."  *Santa Fe*, 380 F.3d at 1272.   Some of the relevant factors include: (1) the extent of the right of way use contemplated by the telecommunications provider, (2) whether the use will be exclusive or nonexclusive, (3) the amount other telecommunications providers would be willing to pay for the use of the right of way, (4) the impact on the profitability of the telecommunications provider, and (5) whether the plaintiff had previously agreed[9] to pay similar fees.  *Id* at 1272-73; *TCG Detroit*, 206 F.3d at 625.   Because of the nature of a totality of the circumstances test, however, these factors are neither conclusive nor the court's only considerations.

## 2.             State Law.

The New Mexico Anti-Donation Clause states: "[n]either the state nor any county . . . or municipality . . . shall directly or indirectly lend or pledge its credit or make any donation to or in aid of any . . . private corporation . . . ."  N.M. Const. art. 9, § 14.  A "donation," in turn, is "a gift, an allocation or appropriation of something of value, without consideration to a person, association or public or private corporation."  *State ex rel. Office of the State Eng'r v. Lewis*, 150 P.3d 375, 389 (N.M. Ct. App. 2006).  To violate the anti-donation clause, the donation must have the character of a donation "in substance and effect," and consideration for the allocation or appropriation "can be a defining element."  *Id.  But see Hotels of Distinction W., Inc. v. City of*

---

[9] The Court takes note of the fact that the previous fee agreements considered in *TCG Detroit* were entered into before the enactment of § 253.  206 F.3d at 620-21.

16

*Albuquerque*, 755 P.2d 595, 597 (N.M. 1988) ("The anti-donation clause is not violated by an expenditure of municipal funds for public purposes on public property.").

A New Mexico statute, entitled "Use of highways and streets; power of county commissioners," permits telecommunications providers to place their facilities on "the public highways, and the streets and alleys of unincorporated towns [and] . . . incorporated cities and towns . . . ." N.M. Stat. Ann. § 62-1-3. The statute also authorizes "the boards of county commissioners and municipal authorities of incorporated cities and towns" to charge telecommunications providers a franchise fee for the use of their public rights of way. *Id.*; *see also Santa Fe I*, 224 F. Supp. 2d at 1308. Typically, a city or town collects a franchise fee from a telecommunications provider by charging a percentage of the provider's gross receipts from the local exchange service. *See, e.g.*, *Santa Fe I*, 224 F. Supp. 2d at 1308. The statute goes on to state, however, that "[a] board of commissioners is authorized to impose charges for reasonable actual expenses incurred in the granting of any franchise pursuant to this section." N.M. Stat. Ann. § 62-1-3.

A New Mexico federal district judge interpreted this statute as limiting county recovery of "user fees" to the "reasonable actual expenses . . . directly relate[d] to the [costs] incurred in managing the actual physical use of the public right of way." *See Bd. of County Comm'rs of Grant County v. Qwest Corp.*, 169 F. Supp. 2d 1243, 1250-51 (D.N.M. 2001). The court also clarified New Mexico counties may not charge franchise fees based on a provider's revenue. *Id.*

### C.    Prohibition.

Qwest asks this Court to declare, pursuant to 28 U.S.C. § 2201 (2008), that both EBID's 2005 and 2007 fee schedules are prohibitive and, therefore, preempted. (*See* Am. Cmplt. at ¶¶

25-28).  Additionally, Qwest asks the Court to exercise its discretion under 28 U.S.C. § 2202 (2008) and order the complete refund of all the fees paid to EBID under both schedules.  (*See* Am. Cmplt. at 6-7).

Qwest has not established that it is entitled to summary judgment on the prohibition matter because a multitude of material facts remain at issue and Qwest has not shown that it is entitled to judgment as a matter of law.

### 1.   Mootness.

Initially, Qwest has not conclusively demonstrated that EBID's 2007 fee schedule and subsequent refund to Qwest did not moot the alleged wrongs in the 2005 fee schedule, nor has Qwest conclusively demonstrated that the 2008 amendments have not mooted the alleged wrongs in the 2007 fee schedule.[10]  Instead, Qwest asserts that EBID's 2007 amendment was a tacit admission that the 2005 schedule was unlawful.  (*See* Pl.'s Reply [Doc. 68] at 2-3).  Not only might such an argument run afoul of Fed. R. Evid. 407 (subsequent remedial measures), but if all of the fees retained by EBID since October 2005 actually reflect the 2007 fees, as EBID alleges (Magallanez Aff. at ¶ 22), then it would seem that Qwest's only true challenge is to the 2007 amendment – especially in a declaratory action.

### 2.   Discretion.

In a similar vein, even assuming that the versions of the Right of Use and License Policy in effect prior to February 13, 2008 granted the EBID directors prohibitive unfettered discretion (*see* Policy at § V(E)(1)), the February amendment at least facially revokes that discretion (*see* Feb. 13, 2008 Am.).  Moreover, the parties agree that the April 2008 amendment clarifies that

---

[10]  The Court addresses the 2007 mootness matter in the following discussion regarding discretion.  *Infra* at Part V(C)(2).

18

the remaining power to "suspen[d] or revo[ke] for noncompliance by the licensee" requires *material* noncompliance.  (*See* Pl.'s Reply at 11).  Though Qwest contends that this provision continues to grant EBID prohibitive discretion, the Court is not prepared to declare that materiality is not a sufficient limit on discretion based only on the nonbinding authority presented by Qwest.  (*See id.*).  This is especially so because Qwest appears to argue that materiality is a sufficient measure with regard to fees (*see* Pl.'s Mot. Summ. J. at 19), and material inhibition is the overall Tenth Circuit test for prohibition.  Finally, Qwest argues that the February and April 2008 amendments did not remove all of the discretionary provisions in the Policy.  (*See id.* at 18) (pointing out that the original version of § V(F)(5) remains intact).

Reading the provision as a whole, however, reveals, at the very least, that it may only apply to EBID members.  (*See* Policy at § V(F)(5)) ("Fees and charges may be waived by the Board when the issuance of specific permits is deemed to be in the interest of EBID.  Water users of EBID who are engaged in agriculture . . . normally will not be assessed fees for permits that improve and supplement their agricultural operations.").  Accordingly, even if the provision is discretionary, Qwest has not conclusively established that it applies to telecommunications providers.

### 3.    Fees.

The true battle in this case is over how to evaluate the worth of EBID's rights of way and/or the use thereof.  The Tenth Circuit has established that "material inhibition" is the test for prohibition.  Qwest attacks both EBID's 2005 and 2007 fee calculation formulas from several directions in an attempt to demonstrate that EBID's right of way fees were and are prohibitive.

19

### a.      October 2005 Amendment.

Assuming the October 2005 fee formula is not now moot, a brief synopsis of Qwest's argument is in order.  Qwest initially claims that the parallel increase from a penny per foot to a quarter per foot resulted in a 2400% increase in land use fees.  (Fitzsimmons Decl. [attached to Doc. 54] at ¶ 5).  Qwest also argues that the crossing increase from $0.15 per foot to $0.50 per foot resulted in a 233% increase.  (*Id.*).

To demonstrate that EBID's 2005 fee increase was prohibitive, Qwest also sets forth four specific projects, all involving the use of EBID right of way, that Qwest needs to construct in order to provide telecommunications service.  According to Qwest, the increased fees, and their resultant impact on Qwest's construction costs, are prohibitive.  The first two projects involve crossings and purportedly resulted in a land use fee, respectively, 3 and 15 times EBID's 1995 fee.  (*Id.* at ¶¶ 6-8).  Moreover, Qwest argues that the proportion of the land use fees, as a share of the construction costs, jumped from 60% and 20%, respectively, to more than double the cost of actual facility construction.  (*Id.*).  The third and fourth projects are parallels.  (*Id.* at ¶ 9).  Qwest alleges that the land use fee for both projects, respectively, was 25 times that calculated under EBID's 1995 fee schedule.  (*Id.* at ¶¶ 6, 9).  And, on the fourth project, Qwest contends that the proportion of construction costs jumped from 10% to 1½ times the actual facility construction.  (*Id.*).

Next, Qwest points to a project involving six residential lines as evidence of prohibition.  (*Id.* at ¶ 10).  Qwest indicates that the land use fee for this particular project went from $2,087.00 to $52,174.00.  (*Id.*).  According to Qwest, the increased fee made it impossible for Qwest to recoup its construction costs and, consequently, denied Qwest the opportunity to earn a profit on

the project.  (*Id.* at ¶ 11).   Without the possibility of profit, Qwest argues, telecommunications providers will choose not to invest in such projects and service is thereby prohibited.  (*Id.* at ¶¶ 11-12).

Lastly, though this point may also now be moot, Qwest contends that EBID's fee calculation formula, apparently since its inception, included a fundamental flaw because EBID incorrectly attempted to recover the time value of money.  (*Id.* at ¶¶ 18-21).   Qwest presents an example to demonstrate the alleged "double-charge," though it does not appear to be an actual Qwest/EBID project.  (*Id.*).   Nevertheless, according to Qwest, the example shows that the formula inflates the "correct" fee by 192%.  (*Id.* at ¶¶ 18-19).

### b.      2007 Amendment.

Qwest also attacks EBID's 2007 amendment on a number of grounds.   Again, Qwest points out the difference between the 1995 fees and the 2007 parallel fees in terms of percentage. (*Id.* at ¶ 30) (concluding there was a 1400% increase).   Qwest then returns to the four purportedly prohibitive examples utilized to challenge the 2005 fees.  (*Id.* at ¶¶ 23-24).   Though Qwest's own calculations show that the 2007 fee schedule significantly reduced the 2005 fees charged for all but one of the projects, Qwest appears to assert that the 1995 fees are still the correct measure for the use of EBID right of way.  (*See id.*).   As Qwest's argument goes, the 2007 fees still result in increases, respectively, 4, 4.9, 11.3, and 6.5 times those calculated under the 1995 fee schedule.  (*Id.*).   For an unexplained reason, however, Qwest appears to abandon its "proportion of the construction costs" argument with regard to the 2007 fees.  (*See id.*).

Qwest takes particular umbrage with EBID's 2007 decision to move from a per foot charge to a flat fee for crossings.  Qwest attacks the flat fee schedule primarily by analyzing it in

per foot terms. (*Id.* at ¶ 26) (arguing that the per foot charge is $45.00 per foot for the first fifty feet and $5.00 thereafter). Qwest goes on to argue that the fee for a fifty-foot crossing is not only a four-fold increase from the original fee schedule, but is even a $354.00 increase from the 2005 fee schedule. (*Id.* at ¶¶ 27-28). Though the fee for a 100-foot and 150-foot crossing is less than under the 2005 schedule, Qwest argues that they are still, respectively, $1,363.00 and $1,077.00 more than they would be under the 1995 formula. (*Id.* at ¶ 27).

Additionally, although the 2007 fee schedule dispensed with EBID's attempt to recover the time value of money, Qwest contends that the 2007 formula also contains a fundamental flaw. Qwest alleges that EBID is attempting to capture the present value of a constant annuity in its current formula, and in so doing, is committing essentially the same double-charge error as was allegedly committed in the 1995 and 2005 schedules, though now at a one percent interest rate. (*Id.* at ¶¶ 34-37). Qwest argues that this double-charge inflates the "correct" fee by 14%. (*Id.* at ¶ 35).

Lastly, Qwest argues that if every single municipality in the State of New Mexico adopted fees equivalent to those set out in EBID's 2007 fee schedule, overnight, Qwest would suffer a 45% reduction in net income. (Estimate).

### c.   Qwest Has Not Summarily Established that Either the 2005 or 2007 Fee Schedules Are Prohibitive.

Again, the Court cannot resolve whether the October 2005 fee schedule was prohibitive (or materially inhibited Qwest's provision of service) without first determining whether the question is moot. As indicated above, *supra* at Part V(C)(1), if the Qwest funds collected by EBID between October 2005 and now actually reflect the fees due under the 2007 schedule, then it would appear that the 2005 is no longer at issue, especially in a declaratory action.

Additionally, it is Qwest's burden to establish not only that no issues of material fact remain, but also that they are entitled to judgment as a matter of law.  Qwest has not established that New Mexico law grants telecommunications providers the right to traverse waters.  *See* N.M. Stat. Ann. § 62-1-3 (allowing county and municipal authorities to permit telecommunications providers to utilize "*public highways and streets and alleys*" for their pipes, poles, wires, cables, conduits, towers, transformer stations and other fixtures, appliances and structures") (emphasis added).

Qwest has also not presented a great deal of information pertinent to their overall use of EBID right of way.  For instance, to what extent do Qwest assets now lie within the bounds of EBID?  How much does Qwest expect this to increase or decrease over the coming years?  Qwest does not even disclose the number of EBID permits it now possesses or the average length of a Qwest parallel or crossing in EBID.  Instead, EBID is the party who provides the Court with a glimpse of this information.  (*See* Magallanez Aff. at ¶¶ 24, 53) (stating that Qwest currently has 697 EBID permits (658 crossing and 39 parallel) and that, based on a review of the crossing permits, the average crossing length is 86 feet).  Consequently, the Court does not have all the information it needs to determine whether either the 2005 or 2007 fees are prohibitive.

Qwest employs a comparative percentage approach throughout its analysis.  Where a case literally involves a penny per foot fee, however, the use of percentages is generally unhelpful and does not do much to prove a fee is prohibitive.  *Compare Santa Fe*, 380 F.3d at 1270-71; *Santa Fe I*, 224 F. Supp. 2d at 1324 (reflecting annual quadrupled costs for utility cabinet placement from $576,166.00 to $2,190,000.00).  If the Court were to follow Qwest's tack, a nickel per foot fee would roughly be the equivalent of the increase in *Santa Fe*.  (*See*

Reading Aff. at ¶ 50).   Moreover, EBID argues that Qwest's percentages skew the actual numbers because the percentages only reflect the increase in per foot fees and not the application of the entire fee formula.  (*See* Magallanez Aff. at ¶¶ 15-17).  Given these weaknesses, the Court cannot grant Qwest summary judgment on the basis of percentages.

Similarly, though framing the 2005 and 2007 increases in terms of multiples for individual projects is helpful, it is not conclusive because some of the 1995 charges involved a penny per foot.  (*See* Reading Aff. at ¶ 50).  Moreover, EBID points out that the specific projects cited by Qwest may not be representative of the typical Qwest use of EBID right of way.  For instance, contrary to what Qwest appears to argue, EBID does not charge for cable replacement, as long as the replacement takes place during an ongoing 25-year term.  (*See* Magallanez Aff. at ¶¶ 25, 36).  This is important to Project 4.  EBID alleges that current Qwest facilities involved in Project 4 have trespassed over EBID property since 1972.  (*See id.* at ¶ 26).  Assuming that Qwest's predecessor had obtained a permit in 1972, EBID would have required Qwest's predecessor to renew the permit in 1997, under the original fees.  According to EBID, then, had Qwest's predecessor followed the permitting process, EBID would have charged Qwest nothing for this project.  (*See id.* at ¶ 27).  Though Qwest's presentation of Project 4 is helpful to the Court, it is appropriately questioned because any allegation of trespassing could have a legitimate effect on fee calculation.

Next, Qwest attempts to demonstrate prohibition by indicating that the 2005 proportion of land use fees, compared to overall construction costs, jumps in Projects 1, 2, and 4.  Again, assuming that the 2005 fee schedule is not moot, Qwest still does not explain what other construction costs are involved in the projects.  The Court cannot declare the 2005 schedule

24

prohibitive in a vacuum.  To render a decision on the basis of construction costs, the Court requires a greater understanding of overall construction costs.  Furthermore, Qwest's construction cost argument is of questionable value because the installation costs in *Santa Fe*, from which Qwest presumably derives this argument, are of a somewhat different character. There, the 30% to 59% increase in installation costs resulted from the City of Santa Fe requirements that Qwest install twice the amount of conduit needed and then turn it all over to the city.  *See Santa Fe*, 380 F.3d at 1262.  That is not the situation here.  Finally, Qwest appears to completely abandon the construction cost argument with regard to the 2007 fee schedule, so the Court is left to wonder if Qwest believes construction costs are a true measure of prohibition.

Returning to Project 4, Qwest contends that this project will serve six residential lines. (*See* Fitzsimmons Aff. at ¶ 10).  Given that New Mexico is a rural, sparsely populated state, it is reasonable to assume that this project likely serves a rural area.  The Court sees some merit in EBID's argument that rural projects are inherently more expensive than urban projects.  (*See* Reading Aff. at ¶ 40).  Moreover, if the settlement agreement that Qwest entered into with the New Mexico Public Regulation Commission (PRC) imposed obligations to serve rural customers, then those obligations might be relevant to this case.[11]  (*See id*. at ¶¶ 43-44). Similarly, state assistance from the Rural Extension Fund may be a relevant consideration.  (*See id*. at ¶ 45).  Moreover, Qwest's Project 4 profitability argument does not address at least the possibility that Qwest could address the alleged profit shortfalls with any "excess" profit earned in its urban areas of service.

---

[11]  Accordingly, Qwest's motion to strike is **DENIED**.

The Court need not go on to address each of Qwest's prohibition arguments at this time because, as demonstrated above, a multitude of material facts and questions of law remain. Nevertheless, the Court will take this opportunity to address three more of Qwest's arguments. First, and perhaps most importantly, Qwest does not address how EBID's purported fiduciary duty to its members should interact with the requirements in § 253. *See* N.M. Stat. Ann. § 73-10-19 (2008). Second, it seems counterintuitive to argue that a landowner is entitled to absolutely no compensation (other than costs) when it grants an outside party the right to traverse its land, even when that use is above or below ground. (*See* Reading Aff. at ¶¶ 27, 30-31, 33-35). At the very least, the Qwest argument tends to run counter to the familiar legal maxim, "*Cujus est solum, ejus est usque ad coleum ed ad infernos*," ("Whoever owns the soil owns everything up to the sky and down to the depths."). *Black's Law Dictionary* 1712 (8th Ed. 2004). Lastly, Qwest's Estimate is presently of little value because it contains at least two glaring assumptions: (1) that every single New Mexico municipality would choose the 2007 EBID fee schedule over a franchise fee, and (2) that every single municipality would adopt fees equivalent to EBID's literally overnight. (*See* Reading Aff. at ¶¶ 51-58). Both assumptions are unrealistic without proof that at least one other municipality is moving in that direction. *See Guayanilla*, 450 F.3d at 17.

In short, both sides present apparently valid arguments with regard to the question of the appropriate evaluation method, supported by expert testimony, and the Court will not unilaterally select a "correct" method, nor find prohibition, based only upon the evidence now in the record. Accordingly, Qwest's Motion for Summary Judgment is **DENIED** with regard to the matter of prohibition.

**D.        Fair and Reasonable Compensation.**

Though the Court need not go on to consider the safe harbor provision because Qwest has not summarily established prohibition, the Court wishes to address an issue of particular interest in the arid Southwest.  Assuming that Qwest is able to establish prohibition, and assuming that the property at issue is some form of right of way, would that right of way have to be a *public* right of way to enjoy protection under § 253(c)?  Moreover, which party carries the burden of establishing that the property is a public right of way?  Did Congress consider unique governmental entities, like EBID, who may own and manage private rights of way?  Could it be that Congress intended that governmental entities should only be able to recover for public rights of way?  Additionally, if this Court declares the EBID property to be public rights of way, what rights of access, if any, does that give to the general public?  Lastly, and most importantly, what impact, if any, would this access have on Southern New Mexico's water supply?

**E.   State Claims.**

**1.        Cost-Based Fees.**

Despite numerous federal cases holding that local governmental entities are not limited to cost based recovery for third party use of their rights of way, *e.g., Santa Fe I,* 224 F. Supp. 2d at 1327, Qwest nevertheless argues that EBID is so limited by the application of state law.  As EBID points out, however, the interpretive *Grant County* cases have found that the cost-limitation provision applies only to counties, not municipalities.  Assuming the Court has the power to limit EBID's recovery under this provision, Qwest nowhere argues that EBID is somehow more like a county than a traditional municipality.  Consequently, the Court cannot grant Qwest summary judgment on this issue.

27

     **2.**               **Anti-Donation Clause**.

EBID has by no means established that the Anti-Donation Clause is applicable to this case, but given the law outlined above, it does not appear to be an irrelevant consideration in determining whether EBID's fees are prohibitive.  Qwest argues that state law prohibits EBID from recovering more than its costs in managing its rights of way.  Because the amount of consideration in a challenged transaction is often determinative of whether or not there has been a violation of the Anti-Donation Clause, the consideration traded between Qwest and EBID may be important – especially if EBID has a fiduciary duty to its members or if EBID would derive no benefit from Qwest's cost-based use of EBID right of way.

## VI.  CONCLUSION.

For all of the aforementioned reasons, EBID's Motion in Limine to Preclude Use of Expert Testimony or, Alternatively, to Extend Discovery Deadlines [Doc. 50], as well as Plaintiff Qwest Corporation's Motion for Summary Judgment [Doc. 54], are hereby **DENIED**.

     **IT IS SO ORDERED.**

 

_____

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**